Filed 7/15/21  P. v. Medina CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESUS MEDINA,<br><br>    Defendant and Appellant. | G060131<br><br>(Super. Ct. No. 17CR004940)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

The opinion filed on June 29, 2021, is hereby modified as follows:

(1)  On page 5, delete the first paragraph, beginning with the words "Gansen again asked appellant," in its entirety, and add a new first paragraph that now reads:

> Gansen again asked appellant to "[t]ell me what happened," and he said, "So when I was layin' her down, uh . . . I accidentally, yeah, touched her there."  He said Jane Doe's skirt "fell up" and he touched the outside of her underwear.  Gansen suggested there was "a little more than just that." Appellant responded, "So she had a skirt, so the skirt flew up.  And then curious, maybe.  I . . . I don't know."  Gansen asked, "Did you feel it?" and appellant replied, "[Y]eah."  He asked how many times, and appellant insisted, "Just once."  Gansen asked if appellant "actually [felt] it," and appellant replied, "Yeah, just a little bit of the outside, yeah."  When asked

if touching Jane Doe aroused him, appellant replied, "It was just dumb.  I don't even know the feeling . . . . Accidental."  Gansen said, "I mean this wasn't accidental.  Let's not go there.  I mean we're doin' good, you know"  Appellant replied, "Yeah."  When Gansen told appellant the situation was not "like the end of the world," appellant replied, "[W]ell, it is for me."  Appellant denied returning a second time.

(2)  On page 11, delete the first sentence of the second full paragraph, beginning with the words, "First, this oversimplifies the issue," and replace it with the following three sentences:

> First, this oversimplifies the issue and ignores other seemingly self-impeaching evidence in the case for which Dr. Urquiza's testimony was relevant.  During neither of her videotaped interviews did Jane Doe break down or become unable to continue.  And although she did begin to cry at one point in her testimony, after a brief break she was able to resume and finish her testimony uninterrupted.

The remainder of this paragraph, beginning with the words "Similarly, she did not disclose," is unmodified.

Appellant's petition for rehearing is DENIED.  These modifications do not effect a change in the judgment.

BEDSWORTH, ACTING P.J.

WE CONCUR:

MOORE, J.

FYBEL, J.

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060131 |
| v. | (Super. Ct. No. 17CR004940) |
| JESUS MEDINA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Monterey County, Carrie McIntyre Panetta, Judge.  Affirmed in part, vacated in part and remanded with directions.

Alexis Haller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Amit Kurlekar and Christen Somerville, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Jesus Medina of two counts of a lewd act on a child under 14 (Pen. Code, § 288, subd. (a)).  In challenging that conviction, he raises a host of claims and sub-claims: (1) The trial court abused its discretion in permitting the prosecutor to call an expert witness without first establishing a proper basis for his testimony.  (2) On two occasions, the expert's testimony improperly exceeded the scope of the limited purpose for which it was admitted, and to the extent appellant's trial counsel failed to object, he was constitutionally ineffective.  (3) The introduction of two prior videotaped interviews of the complaining witness violated appellant's due process rights.  (4) The prosecutor committed reversible misconduct by improperly cross-examining a defense character witness, and to the extent counsel failed to object, he was constitutionally ineffective.  (5) The prosecutor committed reversible misconduct in her closing argument, and to the extent counsel failed to object, he was constitutionally ineffective.  (6) The trial court prejudicially erred by instructing the jury with CALCRIM No. 1193 regarding Child Sexual Abuse Accommodation Syndrome (CSAAS), and to the extent counsel failed to object, he was constitutionally ineffective.  (7)  Even if the individual errors were harmless, their cumulative effect was not.  (8) And lastly, the trial court erred in ordering appellant to submit to AIDS testing pursuant to Penal Code section 1202.1.

We reject appellant's first seven contentions.  We agree the trial court erred when it ordered an AIDS testing requirement.  The order must therefore be vacated, and the matter remanded for further proceedings. The judgment is affirmed in part, vacated in part, and remanded with directions.

FACTS

Seven-year-old Jane Doe performed in an Aztec dance group organized by the White Hawk Indian Council, which also engaged in prayer and spiritual gatherings. Appellant was a leader of the group, and his wife and children also participated.  Jane Doe always liked appellant and thought of him as a brother.

2

Jane Doe, her mother, appellant, appellant's wife, and appellant's children all drove together to a group event in Merced. The event ended about midnight, and afterwards appellant drove his children and Jane Doe back to his Salinas house to spend the night. Jane Doe's mother (Mother) and appellant's wife stayed behind because the group had another event scheduled for early the next morning. No other adult was present at appellant's house, but Jane Doe felt safe with appellant and Mother trusted him with her daughter. This was Jane Doe's first sleep-over away from her parents or overnight stay at appellant's house.

When they got home late that night, appellant carried the sleeping Jane Doe upstairs, placed her on a mattress on the floor next to his daughter's bed, and then left the room. He later returned to the room and pulled down "whatever bottoms [she] was wearing, and then [her] underwear." He touched her vagina with his finger, and moved it around "[i]n like a circular motion" on her skin.

Appellant left, and Jane Doe tried to pull her "pants, [or] whatever [she] was wearing, and [her] underwear up," but "froze" when she heard him returning because she "didn't want [appellant] to know [she] was awake." Appellant then started doing "the same thing," touching her vagina a second time, and again making a circular motion with his finger. He then pulled up her underwear and left the room.

Jane Doe remembered appellant was quiet the first time, but he was "laughing, but not too loud," the second time he touched her. She lay still on the bed and did not "really [do] much of nothing." She felt "mad" and "[v]ery sad" because she did not want him to touch her vagina. She wished her mother were there to "defend" her.

The next morning, Jane Doe briefly spoke to her mother on the phone. Mother said Jane Doe was crying and sounded sad, but she did not mention what had happened the night before. Mother called back later that morning, and asked to speak to Jane Doe, but appellant said it was a bad idea to speak to her just now because "[s]he might cry like she did earlier this morning."

3

Two days after the incident, Jane Doe told her mother over the phone that she never wanted to return to appellant's house because he had touched her vagina. When Mother got home, Jane Doe described to her what had happened, which Mother recorded "to provide to law enforcement." Mother later turned over the recording and Jane Doe's clothing to police.

A few weeks later, Salinas Police Detective Byron Gansen interviewed appellant at the police station. Appellant said he knew the police had asked him to come down to the stationhouse because of Jane Doe's "accusation." He described driving his children and Jane Doe home from the event in Merced and said he took Jane Doe upstairs, took her shoes off, and put her in bed. He put the rest of the children to bed and then went to bed himself.

Gansen left the room and returned with a swab and swabbed appellant's cheek for a DNA sample.[1] Appellant repeated his statement about simply putting Jane Doe and his children to bed. Gansen told appellant he believed "somethin'" might have "happened," and, if it did, appellant's DNA would be present. He explained people make mistakes, and he did not want appellant to look like a liar. Appellant replied, "Uhm . . . something might have. You know, might have. . . ." He laughed and continued, "I don't know. It could of happened. I'm not sure. Uhm . . . I don't remember."

Gansen asked appellant if his intent was to go into the bedroom and "scar this girl for life." Appellant replied, "[N]uh uh." Gansen asked, "Or . . . were you just kinda curious and you thought she was sleepin', and somethin' happened? . . . [T]hat's what we need to find out, and that's what we need to talk about." Appellant replied, "[Y]eah," and when Gansen asked what happened, appellant said, "I made a mistake accidentally."

_____

[1] Subsequent DNA testing evidence was admitted, but it was forensically inconclusive.

4

Gansen again asked appellant to "[t]ell me what happened," and he said, "So when I was layin' her down, uh . . . I accidentally, yeah, touched her there." He said Jane Doe's skirt "fell up" and he touched the outside of her underwear. Gansen suggested there was "a little more than just that." Appellant responded, "So she had a skirt, so the skirt flew up. And then curious, maybe. I . . . I don't know." Gansen asked, "Did you feel it?" and appellant replied, "[Y]eah." He asked how many times, and appellant insisted, "Just once." Gansen asked if appellant "actually [felt] it," and appellant replied, "Yeah, just a little bit of the outside, yeah." When asked if touching Jane Doe aroused him, appellant replied, "It was just dumb. I don't even know the feeling . . . . Accidental." Gansen said, "[T]his wasn't accidental. Let's not go there." Appellant replied, "Yeah." When Gansen told appellant the situation was not "like the end of the world," appellant replied, "[W]ell, it is for me." Appellant denied returning a second time.

Gansen asked appellant whether he would "like to write a letter to the family" to apologize. Appellant said he did, and wrote: "I made a terrible mistake the night of the ceremony. I did touch [Jane Doe] that night only once. I am very sorry I did this. I am not sure what I was doing or what came of me. I apologize to [Jane Doe] and [Mother] for making this terrible mistake. I hope the creator can heal all us including my mind state. I apologize also for not telling you right away. I need counseling and help. I am sorry for any hurt I have caused you and the family. My mind is going crazy. I hope everyone can heal from this. Please forgive me. The prayer will heal all."

Dr. Anthony Urquiza testified as "an expert on the psychological [e]ffects of child abuse or child sexual abuse." Urquiza had treated thousands of child victims of sexual abuse throughout his career, and also taught therapists how to treat children who experienced such abuse. He had not met Jane Doe before testifying, nor reviewed the case files, and his testimony was limited to child sexual abuse in general, not Jane Doe in

5

particular. He further clarified "it would be inappropriate for me to render an opinion about anything specific to this case."

Urquiza said there are "a number of misperceptions or myths that people have about child abuse, child sexual abuse." For example, children who have been sexually abused commonly have positive feelings about their abuser if they had an ongoing prior relationship. Another common misconception was that a victim would cry or appear distressed or very upset whenever he or she was disclosing the abuse. Instead, children learn to cope with their abuse and to emotionally dissociate by suppressing their feelings. Disclosing sexual abuse is often difficult for children to do so victims often disclose their abuse incrementally or in a piecemeal fashion. Furthermore, children who experience sexual abuse often do not remember the precise time sequences, calendar dates, or unimportant details such as the clothes people were wearing. Even so, they often remember the act of abuse itself in detail.

The prosecutor introduced two videotaped interviews of Jane Doe. The first occurred about a month after the incident, when she was still seven years old, and the second about thirteen months later, when she was eight. Each interview was about an hour long, and both were consistent with Jane Doe's initial account given to her mother and with her testimony, which was given when she was nine years old.

In the defense case, four of appellant's longtime friends testified as character witnesses, and said they never saw him behave inappropriately toward children, and they did not believe he was a child molester. Appellant's wife testified he never behaved inappropriately with children, had "a good character," and she had not seen anything leading her to believe he "was a sexual predator of some kind."

Appellant testified he drove Jane Doe and his children back to his house in Salinas after the ceremony in Merced. They arrived home around 2:00 a.m. and he carried the sleeping Jane Doe upstairs to his daughter's bedroom. When he placed her on the mattress, her skirt "flew up," and he pulled it down to cover her, accidentally

6

touching her vagina when he pulled her skirt down. He said he took off her shoes, left the room, and insisted he never returned that night.

Appellant acknowledged he initially told Gansen he did not recall ever touching Jane Doe that night. He also admitted he said it was accidental only after Gansen told him there would be DNA evidence. He conceded he told Gansen he touched Jane Doe's vagina because he was "curious." He also agreed he voluntarily wrote the letter to Jane Doe and her family, that he wrote he was aware what he had done was wrong, and that he was sorry. He also conceded he did not use the word "accident" in his apology letter.

## DISCUSSION

### 1. *The Threshold Admissibility of Dr. Urquiza's Expert Testimony*

Appellant first contends the trial court abused its discretion by permitting Dr. Urquiza to testify at all because "the prosecution failed to identify a relevant myth or misconception that [his] expert opinion was designed to rebut."

#### A. *Additional Background*

The prosecutor made a pretrial motion to admit Dr. Urquiza's generic testimony about abuse victims as a class during her case-in-chief. In it, she argued the defense "will likely attack the credibility of the victim," and such attacks "often" allude to "myths and misconceptions," such as the fact "the victim did not show obvious trauma when disclosing the molestation to adults" and "did not appear frightened, upset, or traumatized by the abuser's conduct[.]" She also referred to the "myth" that child abuse victims immediately "disclose all the details of the molestation to the first person they tell." She insisted Urquiza's testimony was necessary "to educate the jury about such misinformation." She emphasized Urquiza would "in no way vouch for the credibility of [Jane Doe] or opine that she suffers from a 'child molestation syndrome' or some other syndrome, inferring [*sic*] the truth of the allegations." Instead, she assured Urquiza's testimony would be "general and about victims as a class."

7

Defense counsel made a motion "to exclude and limit certain evidence concerning [CSAAS]." He argued the prosecutor should "not be allowed to introduce the equivalent of a profile of a child molester or victim of a molest under the subterfuge of dispelling numerous myths about child molesters or victims of molest." Although primarily asserting the proposed testimony should be excluded under Evidence Code section 352,[2] counsel also insisted any such testimony "must be narrowly tailored to the purpose for which it is admissible, i.e., the prosecution must identify the commonly held 'myth' or 'misconception' the evidence is designed to rebut," and should also be limited to explaining "why such behavior may not be inconsistent with a child's having been abused."

The trial court ruled Urquiza could testify, but with a limiting jury instruction, and his testimony would be confined to "a general class of individuals, and the doctor won't be opining about Jane Doe specifically." It found the evidence "appropriate because I do think there are many myths and misconceptions that a layperson would have about the victim of sexual assault, especially a child." The court felt, with the limiting instruction, the evidence was more probative than prejudicial under section 352.

### B. Analysis

A trial court has broad discretion in deciding whether to admit or exclude expert testimony, and its decision whether expert testimony is admissible is subject to review for abuse of discretion. (*People v. Duong* (2020) 10 Cal.5th 36, 60; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).) Under this standard, a trial court's ruling will not be disturbed, and reversal is not required, unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner, resulting in a manifest miscarriage of justice. (*People v. Chhoun* (2021) 11 Cal.5th 1, 26.) Expert testimony is

---

[2] All further statutory references are to the Evidence Code unless otherwise indicated.

admissible on any subject sufficiently beyond common experience such that the opinion of an expert would assist the trier of fact. (§ 801, subd. (a); *People v. Duong, supra,* 10 Cal.5th at p. 60; *People v. Brown* (2004) 33 Cal.4th 892, 905 (*Brown*).)

Although "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused[,] it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident . . . is inconsistent with his or her testimony claiming molestation." (*McAlpin, supra*, 53 Cal.3d at pp. 1300-1301; see *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 (*Patino*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394 (*Bowker*); cf. *Brown, supra*, 33 Cal.4th at p. 906 ["admissibility of expert testimony does not depend on a showing based on a recognized 'syndrome'"]; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001 [distinguishing CSAAS evidence from inadmissible expert testimony on "'make-up sex'" in a rape case].) Such expert testimony may be "'needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' . . . [Citation.]" (*McAlpin, supra,* 53 Cal.3d at p. 1301.)

In *McAlpin*, our Supreme Court relied on earlier decisions allowing CSAAS testimony and adopted their reasoning to find expert testimony regarding certain *parental* reactions to disclosure of child abuse admissible. (*McAlpin, supra,* 53 Cal.3d at pp. 1300-1302.) Similarly, in *Brown* the court upheld the use of expert testimony on battered women's syndrome, once again relying on the underlying rationale supporting the admissibility of CSAAS evidence. (*Brown, supra*, 33 Cal.4th at pp. 905-908.) Here, Dr. Urquiza's testimony was proffered under the same theory.

Appellant maintains "the prosecution failed to identify any relevant myths or misconceptions that required expert testimony to dispel." Not so. In her written motion, the prosecutor identified five examples of the myths Dr. Urquiza's testimony

9

could potentially dispel, depending on how Jane Doe testified, including how she was cross-examined. In addition, she had earlier sent a letter to defense counsel advising him of a more complete list of ten potentially paradoxical myths and misconceptions Dr. Urquiza might describe and discuss, again depending on how the testimony played out.

Appellant considers this insufficient because none of these "myths and misconceptions" were precisely applicable to Jane Doe's exact behavior. However, such a strict specificity requirement, made in a pretrial motion made prior to Jane Doe's or Dr. Urquiza's testimony, was not necessary. "Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior . . . ." (*Patino, supra,* 26 Cal.App.4th at p. 1744.) "If it were a requirement of admissibility for the defense to identify and focus on the paradoxical behavior, the defense would simply wait until closing argument before accentuating the jurors' misconceptions regarding the behavior. To eliminate the potential for such results, the prosecution should be permitted to introduce properly limited credibility evidence if the issue of a specific misconception is suggested by the evidence." (*Id.* at p. 1745.) We agree with *Patino* that the rationale for admitting expert testimony on child molest victims' behavior is served by allowing such testimony where the victim's credibility is placed in issue due to so-called "paradoxical behavior," even if the prosecutor does not explicitly pinpoint the applicable paradox or paradoxes in a pretrial motion.[3]

As it turned out, defense counsel's cross-examination of Jane Doe carefully avoided being overly confrontational, and narrowly focused on her inability to recall several details of the events that transpired that night. He was able to get Jane Doe to

---

[3]     Appellant also takes issue with the fact Dr. Urquiza's testimony was offered during the prosecutor's case-in-chief, and suggests its real purpose was not really to rebut later defense attacks on Jane Doe's credibility. However, he concedes courts have held there is nothing inherently improper in permitting the prosecutor to preemptively bolster witness credibility in the case-in-chief. (See, e.g., *Patino, supra,* 26 Cal.App.4th at p. 1745.)

admit she could not remember the names of appellant's children, exactly where they were when the group arrived at appellant's house, the details of the mattress she was laid on, or the exact amount of time between the relevant events. These were points Dr. Urquiza had carefully discussed. He had pointed out molest victims often cannot recall certain collateral details and a child's inability to recall certain details, while at the same time clearly remembering others, was also not inconsistent with having been molested.

Appellant points out defense counsel did not suggest Jane Doe was "lying or knowingly providing a false account of the incident." Rather, the defense was that Jane Doe was simply mistaken about what had happened and the touching was merely accidental. As such, appellant maintains there was no need for expert testimony because counsel "conceded that [Jane Doe] actually believed that she had been abused."

First, this oversimplifies the issue and ignores other seemingly self-impeaching evidence in the case for which Dr. Urquiza's testimony was relevant, including the fact Jane Doe did not break down and be unable to continue in either of the two videotaped interviews or in her testimony. Similarly, she did not disclose to her mother what had happened when they first talked, she did not resist or speak out while being molested, and she still thought of appellant as like a brother. It is not the case that such expert evidence may only be used to rebut specific defense attacks on a victim's credibility. Instead, where a victim's conduct, including her testimonial demeanor, might put her credibility at issue as Jane Doe's did here, expert psychological testimony may be properly admitted to rehabilitate her credibility, and to explain how such conduct is not necessarily inconsistent with believability. (See, e.g., *People v. Housley* (1992) 6 Cal.App.4th 947, 956 [victim "directly placed her credibility in issue by retracting her molestation claims and offering a new story at trial;" expert testimony was properly admitted]; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450 [where prosecutor identified misconceptions about victims' conduct, trial court did not err in permitting

11

expert to testify despite defendant's claim he did not put in issue any of the paradoxical behaviors of child molestation victims].)

Second, the argument overlooks the very salient fact that Jane Doe consistently stated appellant had touched her vagina *twice and on two separate occasions*. Moreover, she had also described her behavior in the interim, her becoming "frozen" when she heard appellant returning, and the fact appellant made "laughing" noises the second time he rubbed her vagina in a "circular motion." Simply put, Jane Doe's testimony, if believed, was absolutely inconsistent with appellant's insistence he only touched her once, that she was just mistaken, and it was merely an accident. Her credibility, especially as to the specific details of her testimony, were of prime importance. Indeed, without them there would not have been a count 2. The testimony of a witness who is "mistaken" about such things is no less at issue than that of one who prevaricates.

In admitting Dr. Urquiza's limited expert testimony, the trial court did not act in an arbitrary, capricious, or patently absurd manner resulting in a manifest miscarriage of justice. (*People v. Chhoun, supra,* 11 Cal.5th at p. 26.) There was no abuse of discretion.[4]

---

[4] Having concluded the trial court reasonably concluded Dr. Urquiza's testimony was admissible, and not more prejudicial than probative, we also find its admission did not violate appellant's constitutional right to a fair trial. "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913; cf. *Patino, supra*, 26 Cal.App.4th at p. 1747 [the use of CSAAS evidence at trial does not render the trial fundamentally unfair].) Dr. Urquiza's testimony was relevant to the Jane Doe's credibility, was properly limited, and did not render appellant's trial fundamentally unfair. (Cf. *Patino*, *supra,* 26 Cal.App.4th at p. 1747 ["[I]ntroduction of CSAAS testimony does not by itself deny appellant due process"]; see also *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [admission of "battered child syndrome" evidence did not violate defendant's due process rights].)

## 2. *The Substance of Dr. Urquiza's Testimony*

### A. *"Profiling"*

Appellant also attacks the underlying substance of some of Dr. Urquiza's testimony, arguing he "effectively told the jurors that [Jane Doe] fit the profile of a victim of child sexual abuse" and therefore implied she was indeed such a victim.

However, Dr. Urquiza's testimony on the several forms of dissociative behavior exhibited by child abuse victims, and the possible effects of disassociation on victims' ability to recall details surrounding episodes of abuse, was admitted only as to Jane Doe's credibility. Urquiza's evidence was limited to discussing child sexual abuse victims generally, and nothing in his testimony indicated he had diagnosed Jane Doe or believed she had been abused. *Indeed, he had never met Jane Doe, read the reports, and knew nothing about her or the particulars of the case.*

This case bears very little resemblance to *Bowker, supra,* relied on by appellant, where the expert's testimony "accounted for nearly 70 pages of reporter's transcript and was replete with comments designed to elicit sympathy for child abuse victims and solicitations that children should be believed." (*Bowker, supra,* 203 Cal.App.3d at p. 394.) In addition, there "the picture painted by [the expert] happened to be of the two children in the case." (*Ibid.*) Here, Dr. Urquiza's initial testimony comprises 17 pages of testimony, 7 of which are devoted to laying the foundation for his expertise, and his testimony did not allude to any details about Jane Doe or the incident. *Bowker* has little bearing on the present case.

"Contrary to appellant's position, [Dr. Urquiza] did not suggest [Jane Doe's] claims were credible simply because she exhibited some behaviors common to abuse victims. . . . It is thus unlikely the jury would interpret [his] statements as a testimonial to [Jane Doe's] credibility. On this record we are satisfied the psychological testimony was properly used to dispel certain common misconceptions regarding the behavior of abuse victims." (*People v. Housely, supra,* 6 Cal.App.4th at pp. 955-956.)

13

Simply put, Dr. Urquiza's testimony did not improperly "profile" Jane Doe as a child molest victim.

### B. The Juror's Question

Appellant also claims the trial court erred by asking Dr. Urquiza a juror's question about the long-term effects of child sexual abuse. He argues the question was improper because such effects were irrelevant to Jane Doe's credibility and improperly appealed to the jurors' sympathy.[5]

Defense counsel objected to the question: "[I]t was prejudicial in the sense that it has nothing to do with this case at all, which is true, and it engenders some kind of worry about what's going to happen to Jane Doe in this case, and what's in the future for her. That seems to me to be implying that she is going to be somehow one of those children [who do experience the long-term effects]. And I don't think that it's . . . something the jury should hear. I think that's prejudicial."

The court responded, "I thought it could go to explain her demeanor here in court testifying two years after the alleged incident, how it affects someone if they had been the victim of this sort of offense, and what they may expect to see in terms of behavior."

But that is precisely the problem. The court's theory of relevance was that if Jane Doe showed any of these short- or long-term behavioral effects, it tended to show she was indeed a victim of child molest, i.e., how she was "affect[ed]" by "this sort of offense." It had nothing to do with rehabilitating her credibility in light of myths and misconceptions and was therefore irrelevant to the limited nature of Dr. Urquiza's testimony. It also invited the jury's attention to how Jane Doe might be adversely affected in the future, and away from the only relevant concerns before them: her credibility and appellant's guilt. And Dr. Urquiza's response did the same. He

---

[5] The juror's written question read: "What lasting effects does child sexual abuse leave on a child?" The trial court asked the question verbatim, but added an additional sentence: "Again in general."

14

mentioned how abuse affected victims' ability to have healthy relationships in the future, sexual issues, substance abuse problems, self-injury and other suicidal behavior, and even post-traumatic stress behavior. He used the terms "revictimization" and "symptom profile," which certainly have nothing to do with her testimonial credibility. This was error.

Even so, this exchange was brief, taking up only about a page and a half of Dr. Urquiza's testimony. Part of his response also involved dissociation, which was relevant to how Jane Doe testified and behaved in her interviews when she did not act overly emotional or disturbed as she described what had happened. Furthermore, in the context of the entire trial, the error was not prejudicial. Dr. Urquiza told the jury he had never met Jane Doe, was completely unfamiliar with the case, and was not opining whether or not Jane Doe had been abused. The jury was instructed not to consider Urquiza's testimony as evidence of whether there was molestation, and the prosecutor emphasized the same point several times in her closing arguments. The jury was also instructed they could not let sympathy for an alleged victim influence their decision. (See CALCRIM No. 200.)

Appellant argues that because "the introduction of the evidence of the long-term harm of sexual abuse violated appellant's fundamental right to a fair trial, the court should apply the *Chapman* harmless error analysis."[6] "In similar situations, however, our high court has applied instead the standard of *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)], under which we reverse only if it is reasonably probable the defendant would have reached a more favorable result in the absence of the error." (*People v. Wilson* (2019) 33 Cal.App.5th 559, 571; see *People v. Prieto* (2003) 30 Cal.4th 226, 247 ["The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in

---

[6] *Chapman v. California* (1967) 386 U.S. 18.

15

the absence of the error' [Citations.]"]; *People v. Bledsoe* (1984) 36 Cal.3d 236, 251-252 [applying *Watson* standard where evidence of rape trauma syndrome erroneously admitted to prove victim was actually raped].) We apply the *Watson* standard here.

Considered in the context of all the other evidence in this case, we find this single question and answer were not so significant as to make appellant's trial "fundamentally unfair." Furthermore, "[u]nder *Watson*, defendant must demonstrate a reasonable probability that a result more favorable to defendant would have been reached absent the error." (*People v. Lucas* (2014) 60 Cal.4th 153, 263, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) Appellant has not made such a demonstration. It is not reasonably probable the verdict in this matter would have been more favorable to appellant but for this single erroneous question and answer. Thus, although the trial court erred in asking the juror's question, it was harmless.

3. *Jane Doe's Prior Statements*

Appellant's next contention is that the trial court prejudicially erred by permitting the prosecutor to introduce the two prior videotaped interviews with Jane Doe and that their admission violated his state and federal constitutional rights to a fair trial.

A. *Additional Background*

The prosecutor brought a pretrial motion to introduce three of Jane Doe's prior statements pursuant to section 1360.[7] Two were the videotaped interviews and the third was Jane Doe's mother's testimony as to what Jane Doe had told her two days after the incident. Defense counsel objected on the grounds that section 1360 "is a violation of [appellant's] federal constitutional rights to a fair trial." He conceded section 1360 was

---

[7] In pertinent part, that section provides: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another . . . is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child . . . [¶] . . . [t]estifies at the proceedings." (§ 1360.)

16

technically satisfied, but insisted it was "an unconstitutional statute."[8] The court ruled all three prior statements were admissible under section 1360.

"We review a trial court's admission of evidence under section 1360 for abuse of discretion." (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367; *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1330.) An erroneous admission of evidence does not result in a reversal unless the error resulted in a miscarriage of justice. (§ 353, subd. (b).) "If admission of the hearsay statements violated a state statute alone, we apply the standard articulated in *People v. Watson* [citation], and reverse only if there is a reasonable probability of a result more favorable to the defendant in the absence of the error." (*People v. Roberto V., supra,* 93 Cal.App.4th at p. 1373.) However, if the error violated a defendant's constitutional rights, we must determine whether the error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. 18.)

### B. Analysis

Below appellant attacked the facial constitutionality of section 1360, not its application to this case. He does not repeat that facial challenge on appeal. Instead, he now claims Jane Doe's prior statements were "unduly prejudicial" because they were cumulative of her testimony and thus "rendered the trial fundamentally unfair." However, trial counsel did not raise these claims below, nor make a section 352 "prejudice" objection to their introduction.

"A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.] '"To support a determination of facial unconstitutionality, voiding the statute as a whole, [appellant] . . . must demonstrate that the [statute's] provisions inevitably pose a present total and fatal conflict with applicable

---

[8] The court found Jane Doe's statement to her mother was also admissible under the fresh complaint doctrine. (See *People v. Brown* (1994) 8 Cal.4th 746, 749-750 [molest victim's complaint admissible for nonhearsay purpose].) Appellant does not contest the admissibility of Jane Doe's statement to her mother.

17

constitutional prohibitions.”’ [Citations.]” (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) In contrast, when a defendant claims a facially valid statute has been *applied* in a constitutionally impermissible manner to the defendant, the court must evaluate the propriety of the application of the statute to the facts of the particular case to determine whether the application of the statute has an unconstitutional result. (*Ibid.*)

Here, however, neither the trial court nor the prosecutor had an opportunity to address whether application of section 1360 to the facts of this case would unconstitutionally infringe upon appellant’s right to a fair trial. Indeed, trial counsel did not even attempt to explain how it did, and instead summarily asserted facial unconstitutionality. The claim is therefore forfeited. (*People v. Flinner* (2020) 10 Cal.5th 686, 726 [“[A] defendant forfeits an argument on appeal where he fails to object at all to the evidence in the trial court or when he objects on substantively distinct grounds”]; see also § 353, subd. (a).)

To avoid forfeiture, appellant bootstraps his not-raised-below “prejudice” argument into a quasi-constitutional one by falling back on a catch-all “due process” argument. However, such an argument is still essentially a challenge to the admission of Jane Doe’s statements under section 352, and not to the constitutionality of section 1360. Appellant’s obligation to timely and specifically object to evidence in the trial court on the same grounds raised on appeal is not avoided by a subsequent revarnishing with the gloss of a constitutional “due process” claim. Indeed, “‘[n]o procedural principle is more familiar to this Court than that a constitutional right,’ or a right of any other sort, ‘may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.’ [Citations.]” (*United States v. Olano* (1993) 507 U.S. 725, 731.) Likewise, converting a facial constitutional challenge to section 1360 to an as-applied challenge or a “due process” claim, without having given the prosecution and the trial court an opportunity to respond or assess what in reality is a newly minted section 352 balancing claim is unwarranted.

18

But forfeiture notwithstanding, the claim also fails on the merits, and counsel was therefore not ineffective for not raising an unmeritorious objection.

In support of his new contention, appellant cites two out of state cases: *Burke v. State* (Okla. Crim. App. 1991) 820 P.2d 1344, 1348, superseded by statutory repeal (see Okla. Laws 1993, ch. 197, § 4); and *State v. Seever* (Mo. 1987) 733 S.W.2d 438, 441, superseded by statute as stated in *State v. Evans* (Mo. App. 2016) 490 S.W.3d 377, 388. We are not bound by the decisions of our sister-state courts (*People v. Troyer* (2011) 51 Cal.4th 599, 610), and we find neither case persuasive.

In *Burke v. State, supra,* a case with a dissenting opinion and a swing opinion concurring in the result only, a three-judge panel of the Oklahoma Court of Criminal Appeals found an Oklahoma statute similar to section 1360 *facially* unconstitutional because it allowed for the introduction of an *unavailable* child's prior video-recorded statement, and thus violated the Sixth Amendment's confrontation clause. (*Id.*, 820 P.2d at p. 1348.) In an obiter dictum in the lead opinion, the author stated he was "further troubled" by the fact that in some cases the videotape would in effect allow the prosecution to "present its principal witness twice." (*Ibid.*) The source of his "troubles," however, was not rooted in any reasoned constitutional analysis. Rather, it was instead based on a passing reference to a since-overruled Texas appellate court decision that found due process violated by a Texas statute that "require[d] the defendant to call as a witness his accuser if he wants to question the witness." (*Long v. State* (Tex. Cr. App. 1987) 742 S.W.2d 302, 320, overruled in *Briggs v. State* (Tex. Cr. App. 1990) 789 S.W.2d 918, 924.)

In *State v. Seever, supra,* the Missouri Supreme Court found "improper bolstering" where the trial court admitted a videotaped statement of the victim, who also testified at trial. (*Id.,* 733 S.W.2d at p. 441.) Later, in *State v. Silvey* (Mo. 1995) 894 S.W.2d 662, 672, abrogated on other grounds by *State v. Porter* (Mo. 2014) 439 S.W.3d 208, the court clarified that "[t]he bolstering [in *Seever*] was improper because it

19

effectively allowed the witness to testify twice." "What *Seever* prohibits is the use of such a videotape to wholly duplicate the live testimony of the child witness." (*Ibid.*)

However, appellant fails to mention that the restriction in *State v. Seever* was later modified and superseded by revisions to the Missouri statute concerning the admissibility of recordings of children under 14. (See *State v. Fears* (Mo. App. 2007) 217 S.W.3d 323, 326-327 [statute now specifically provides the recording of a verbal or nonverbal statement of a child who testifies at the proceeding "*shall be admissible* in addition to the testimony of the child at the proceeding *whether or not it repeats or duplicates the child's testimony*" (some italics omitted)].) Thus, *State v. Seever* is not only not a constitutional case, which appellant concedes in a footnote, it is also no longer valid law on this issue in the state where it was decided.[9]

Although he avoids framing the question in such a way, appellant's argument is really that section 1360 violates a defendant's right to a fair trial because such admission might unfairly "bolster" a victim's testimony by allowing him or her to testify more than once. Appellant provides no California authority to support such a claim, and his out of state authority is either inapplicable or unpersuasive.

We find no fundamental unfairness in section 1360, either facially or "as applied" to the circumstances of this case, and cannot conclude the trial court acted beyond the bounds of reason in admitting Jane Doe's prior statements, both of which fully complied with the statutory requirements.[10] (Cf. *People v. Brodit, supra,* 61

---

[9] Appellant also refers to *Cogburn v. State* (1987) 292 Ark. 564, and *State v. Taylor* (1999) 196 Ariz. 584, but both are inapt. *Cogburn v. State, supra,* involved an Arkansas statute regarding depositions that had not been complied with. (*Cogburn v. State, supra,* 292 Ark. at p. 569.) No such statute is involved here; indeed, in California, depositions are not permitted in criminal cases except under the strict conditions of conditional examinations. (See Pen. Code, §§ 1335 et seq.) *State v. Taylor, supra,* is also of no relevance because it involved the constitutionality of a legislatively created hearsay exception that conflicted with the Arizona separation of powers doctrine. (*Id.*, 196 Ariz. at p. 588; see Ariz. Const., art. VI, § 5, no. 5.)

[10] We have reviewed both videotapes and find the trial court did not err in finding "the time, content, and circumstances of [Jane Doe's statements] provide sufficient indicia of reliability." (§ 1360, subd. (a)(2).) The time- and date-stamped videos show a relatively composed and articulate seven-year-old Jane Doe in the first video and eight-year-old in the second. In both she appears to understand and answer the non-leading questions posed to her, and describes what happened and how she felt with no indication of coaching or dissimulation. She is at times

Cal.App.4th at p. 1325 [section 1360 did not violate due process on the grounds it unfairly "provide[d] a 'nonreciprocal' benefit to the state"].) There was no due process violation.

*4. The Prosecutor's Cross-Examination of a Character Witness*

Appellant next contends the trial court abused its discretion by permitting the prosecutor to improperly cross-examine a defense character witness. Alternatively, the prosecutor committed prejudicial misconduct by engaging in such cross-examination. And as an alternative, because defense counsel failed to object to this cross-examination, he was constitutionally ineffective.

*A. Additional Background*

Appellant's friend Y.C. testified as the last of four defense character witnesses. On direct examination, she was asked, "Do you believe [appellant is] a child molester?" to which she replied, "No." On cross-examination, the following ensued:

"[Prosecutor]: You came here today at [appellant's] request to testify about his character, didn't you?

"[Y.C.]: From his lawyer, yes.

"[Prosecutor]: And you've talked to him about the case?

"[Y.C.]: I've – very briefly. *I've tried not to ask too many questions, as not to change my opinion.* [Italics added.]

"[Prosecutor]: So, you don't want to know more information?

"[Y.C.]: If you feel like giving me more information.

"[Prosecutor]: Did you want to know more information?

"[Y.C.] That would be up to you."

---

fidgety, shy, and uncomfortable with some questions, but she is not overly emotional, and she does not break down or lose control. We perceive nothing in the videos that unfairly appeals to the sympathies or emotions of the jurors.

Y.C. continued to evade the prosecutor's questions until the trial court finally intervened and directly asked her, "Prior to [you] testifying did you want to know more [information about this]?" and she replied, "No." The prosecutor then continued:

"[Prosecutor]: So your opinion is based on the little information that you have about this case?

"[Y.C.]: My opinion is based on my experiences with him.

"[Prosecutor]: But it's not based on any of the facts in this case?

"[Y.C.]: I don't have the facts in the case, because it's an ongoing case. I would prefer not to have information if it's an ongoing case. So, I haven't asked.

"[Prosecutor]: If you knew, in fact, he did touch a seven-year-old's vagina, would that change your opinion?

"[Y.C.] If I had evidence and proof. I mean, I wouldn't – I've known him for so long. He interacted with my daughter and cared for my daughter. And I've never seen that. So beyond the scope if I would believe that.

"[Prosecutor]: I'm not asking if you believe it. I'm asking you if you knew that that was true, would your opinion –"

Defense counsel objected to the question, and the court sustained the objection. The prosecutor rephrased the question and asked, "If you had other information that contradicted what you've seen before, is it possible for your opinion to change?" Counsel again objected, and after an unreported side-bar, the objection was overruled, and Y.C. answered:

"[Y.C.]: "I guess it would depend on the information given to me.

"[Prosecutor]: And if you had heard that he did touch a seven-year-old's vagina, would it be possible for your opinion to change?

"[Y.C.] Depending on who I heard it from.

"[Prosecutor] So it is possible?

22

"[Y.C.] Depending on who I heard it from. It would be possible depending on who I heard it from."

We know defense counsel objected to two of the prosecutor's questions. Unfortunately, we do not know the grounds for his objections and the side-bar conference was not reported. However, in fairness to appellant and to avoid forfeiture (§ 353, subd. (a)), and the ineffectiveness of counsel back-up claim, we will assume trial counsel preserved the objection for appeal.

*B. Analysis*

Generally, evidence of someone's character is inadmissible, whether in the form of an opinion, reputation, or specific instances of conduct, to prove that person's conduct on a specific occasion. (§ 1101, subd. (a).) In criminal cases, however, "evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation" is admissible when "[o]ffered by the defendant to prove his conduct in conformity with such character or trait of character[; or] [¶] [o]ffered by the prosecution to rebut evidence adduced by the defendant . . . ." (§ 1102, subds. (a) & (b); see also § 1100 [character evidence also "include[s] evidence . . . of specific instances of such person's conduct . . . ."].)

"When a witness testifies to a defendant's good reputation, the prosecutor is entitled to ask in good faith if the witness has heard of misconduct by the defendant. [Citations.] . . . [¶] . . . When a witness offers an opinion of a defendant's good character, it is often based on personal knowledge as well as reputation. [Citation.] This opens the door for the prosecutor to offer rebuttal evidence of defendant's character. [Citation.] . . . The prosecutor can test the witness's opinion by asking about his or her knowledge of the defendant's misconduct [citation], even if the witness professes ignorance. [Citation.]" (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1528.)

Thus, "'[w]hen . . . a witness is called to express an opinion as to the good character of the defendant, the prosecution must have the opportunity [under the

23

Evidence Code] to let the jury test the validity of the opinion or the weight to be given to it by asking whether the holder of the opinion has knowledge of events or acts which have indisputably occurred.' [Citation.] . . . When such cross-examination of a good-character witness is permitted, the jury should be instructed that such questions and answers of a character witness are to be considered only for the purpose of determining the weight to be given to the opinion or testimony of the witness.' [Citation.]" (*People v. Clair* (1992) 2 Cal.4th 629, 682-683.) Notably, nothing in section 1102, subdivision (b), excludes evidence of the *current* charged offenses from the prosecution's ability to counter a defendant's good character opinion evidence, and appellant concedes there is no California authority to support a contrary conclusion.

Indeed, in *People v. Qui Mei Lee* (1975) 48 Cal.App.3d 516, the court held such cross-examination was not improper. "No reported California case . . . has decided whether (as defendant contends) it is improper for a defense character witness to be asked on cross-examination if he has heard that the defendant committed the act or acts *for which he is on trial*. [Fn.] Out-of-state authorities are not uniform on the subject, some permitting such interrogation, while others hold that such cross-examination must be confined to acts antecedent to the offense for which the defendant is on trial. [Citation.] [¶] . . . [W]e hold that the cross-examination was proper." (*Id.* at p. 526.)

Appellant attempts to distinguish *People v. Qui Mei Lee, supra,* by arguing that the cross-examination question at issue in that case referred to the fact the defendant was *charged* with the crimes – an indisputable fact – not that he had actually committed them. We find the distinction unpersuasive. Nothing supports limiting a hypothetical question to only the *existence* of an accusation, but not the *truth* of one. If a jury should know whether a character witness will overlook an accusation, it should know whether the witness will overlook evidence of guilt itself. The relevance of such a question is the witness' credibility and, "on cross-examination, such lack of credibility may be demonstrated by asking [her] whether [she] has heard of the *commission* of the offense

24

for which the defendant is on trial." (*Id.,* 48 Cal.App.3d at p. 527, italics added.)  And, "if [she] has heard of the offense charged, the validity of [her] opinion may be affected thereby." (*Ibid.*)  In other words, if Y.C. learned that appellant actually *committed* the offense with which he was charged – touching a seven year old's vagina – the validity of any continuing opinion that appellant is not a child molester would be most likely "affected thereby."

Appellant refers us to several federal cases holding a prosecutor may not ask character witnesses hypothetical questions that assume the defendant's guilt of the precise acts for which he is on trial.[11]  Even though decisions of the lower federal courts are not binding on California courts (*People v. Williams* (2013) 56 Cal.4th 630, 668), we note there is a split of authority on this issue, with two federal circuit courts of appeals holding otherwise; the United States Supreme Court has not weighed in.

In *United States v. Kellogg* (3d Cir. 2007) 510 F.3d 188 (*Kellogg*), the court distinguished *reputation* evidence from *opinion* evidence, and in the case of the latter stated:  "In our view, there is nothing inherent in guilt-assuming hypotheticals, in the abstract, that makes them unfairly prejudicial, let alone so prejudicial as to constitute a *per se* violation of due process.  We therefore see no need to adopt a bright-line rule prohibiting a potentially probative type of inquiry.  Generally speaking, a person testifying regarding a present opinion should be open to cross-examination on how additional facts would affect that opinion.  In the context of *opinion* character testimony cross-examination about the charged crime tests 'both the witness' bias and the witness' own standards by asking whether the witness would retain a favorable opinion of the defendant even if the evidence at trial proved guilt.'  [Citation.]  Such evidence may aid

---

[11]  Appellant cites: *United States v. Shwayder* (9th Cir. 2002) 312 F.3d 1109, 1120 ; *United States v. Woods* (4th Cir. 2013) 710 F.3d 195, 207; *United States v. Guzman* (11th Cir. 1999) 167 F.3d 1350, 1352; *United States v. Oshatz* (2d Cir. 1990) 912 F.2d 534, 539; *United States v. McGuire* (6th Cir. 1984) 744 F.2d 1197, 1204; *United States v. Mason* (4th Cir. 1993) 993 F.2d 406, 409; *United States v. Candelaria-Gonzalez* (5th Cir. 1977) 547 F.2d 291, 294.

in the jury's ultimate credibility determinations and in deciding how much weight to give to a defendant's character evidence." (*Id.* at p. 196, second italics added.)

Similarly, even though cross-examination of witnesses who testify only as to a defendant's *reputation* in the community with hypotheticals assuming guilt may be improper, "similar cross-examination of witnesses who . . . give *their own* opinion of the defendant's *character* is not error." (*United States v. White* (D.C. Cir. 1989) 887 F.2d 267, 274-275, italics added.) We find *Kellogg* and *White* more persuasive.

Moreover, as to the cases finding such cross-examination improper, all involved federal criminal prosecutions, and none addressed or discussed the effect of the strict limiting instruction required of character evidence in California courts. (See CALCRIM No. 351; *People v. Clair, supra,* 2 Cal.4th at pp. 682-683 ["'When such cross-examination of a good-character witness is permitted, the jury should be instructed that such questions and answers of a character witness are to be considered only for the purpose of determining the weight to be given to the opinion or testimony of the witness' [Citation.]"].) Indeed, in none of the cases appellant cites is there any indication of a limiting instruction akin to CALCRIM No. 351 having been given.[12]

Here, Y.C. stated she was unaware of the details of what appellant was charged with. More importantly, she expressly did not want to know those details, and candidly said "I've tried not to ask too many questions, *as not to change my opinion.*" (Italics added.) The obvious implication was that if she was told what appellant was accused of doing, she *would* change her opinion, something which she appeared not to want to do.

The prosecutor was therefore logically entitled to ask her if her opinion would be changed by the details Y.C tried to avoid learning about so she would not have

---

[12]     Appellant's reliance on the hoary *Gaugh v. Commonwealth* (Ky. 1935) 87 S.W.2d 94, and *Craft v. State* (Miss. 1965) 181 So.2d 140, is factually misplaced because both are *reputation* cases. Here, appellant's reputation at the time of the incident was not the subject of his character witnesses' testimony, including Y.C.'s.

to *change her opinion*. The rationale for the prosecution to ask such questions is that they test the witness' knowledge of the defendant's character. A witness' deliberate attempts to stay ignorant of the underlying facts of the case is relevant to such a test. (See *United States v. Oshatz, supra,* 912 F.2d at p. 544 (conc. opn. of Mukasey, J.) ["If the witness' judgment is distorted either by such partisanship that the witness would think highly of the defendant despite misbehavior, or by a warped ethical standard, the witness' opinion may be correspondingly discounted"].)

"A good faith belief by the prosecution that the acts or statements asked about actually happened suffices to allow questioning of the witness about their occurrence." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 358.) Based on the evidence she presented in her case-in-chief, the prosecutor was certainly entitled to a "good faith belief" that the acts in question "actually happened." (See *People v. Qui Mei Lee, supra*, 48 Cal.App.3d at p. 528 ["[L]ong before [the witness] was cross-examined as to whether he had heard of the acts mentioned by the prosecutor, the prosecutor had already placed evidence of all those acts before the jury as integral parts of the People's case"].)

Finally, as noted and unlike the federal cases appellant relies on, here the jury was instructed with CALCRIM No. 351, and specifically told: "The attorney for the People was allowed to ask defendant's character witnesses if they had heard that the defendant had engaged in certain conduct. These 'have you heard' questions and their answers are not evidence that the defendant engaged in any such conduct. You may consider these questions and answers only to evaluate the meaning and importance of a character witness's testimony." Similarly, the jury was told: "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." (See CALCRIM No. 303.)

Thus, "any possibility the jury might have misunderstood the purpose of this evidence was obviated by the limiting instruction, which we presume the jury

27

understood and followed." (*People v. Panah* (2005) 35 Cal.4th 395, 492 [defense expert's opinion properly impeached by lack of knowledge of the defendant's criminal record]; *People v. Edwards* (2013) 57 Cal.4th 658, 746 ["'We of course presume "that jurors understand and follow the court's instructions." [Citation.]'"].) Appellant points to nothing in the record to rebut that presumption. We therefore find the prosecutor's brief questioning of Y.C. regarding her opinion of appellant's character was not misconduct, and the trial court did not abuse its discretion in permitting it.

5. *Prosecutorial Misconduct in Closing Argument*

Appellant next contends the prosecutor committed reversible misconduct in her closing argument, and because counsel failed to object, he was ineffective.

A. *Additional Background*

During her closing argument, the prosecutor explained to the jury that the testimony of a single witness can be sufficient to prove any fact, and specifically referred to CALCRIM No. 1190.[13] Thus, she said, "[T]he testimony of a complaining witness, Jane Doe's testimony, is sufficient if you believe her. That's all you need to convict." In explaining why the jury should believe Jane Doe, the prosecutor stated:

"[Prosecutor]: The reason you're here as a jury is to decide can [Jane Doe] be believed? Is she credible? We talked about how you can't just say[,] 'I don't believe her because she's a child.' You can't just say, 'You know what, I'm going to take the adult's word over hers because she's a kid.' And you have to look at her cognitive level, how well was she able to describe things, was that credible, or how old she is. [¶] So those are the things that you can consider when evaluating is she telling the truth? What you cannot consider in evaluating '[I]s Jane Doe telling us the truth[?]' is the fact that she wasn't sobbing throughout her entire testimony, the fact that she didn't go up there and start crying and – crying during the forensic interviews. All that is improper for you to

---

[13] "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." (CALCRIM No. 1190.)

28

consider in deciding that she's lying.  [¶]  And the reason for that is because you heard from Dr. Urquiza, the forensic – the expert psychologist in child sexual abuse.  He explained that we have in society [myths] and misconceptions.  Just generally things that sometimes people expect.  When it comes to child sex abuse, someone might expect that, you know what, if something that traumatic happened to a child, why isn't the child crying about it?  [¶]  That's not for you to consider in deciding whether she's lying.  That fact alone doesn't prove that she wasn't telling the truth.  Same with the fact that maybe her memory wasn't perfect on every detail.  Memory isn't perfect, especially when it comes to trauma.  And we also learned from Dr. Urquiza peripheral details are different than the main details.  If you get some peripheral details wrong, it does not mean that you're not telling the truth."

The prosecutor told the jurors Urquiza was "talking about what the studies show, what the expertise is in the field[,]" but she emphasized he was not there to opine whether Jane Doe was a victim or whether she should be believed.  "Now, I want to be clear, Dr. Urquiza . . . wasn't here to tell you that you have to believe Jane Doe.  He was not here to tell you that Jane Doe is in fact a victim.  That's not his job.  That's your job as a jury.  He has never met Jane Doe.  He hasn't reviewed the facts."  And even if Jane Doe exhibited behavior similar to what Dr. Urquiza described, she emphasized it does not "mean she's a victim."  She then went on to discuss CALCRIM No. 226, the list of additional things the jury could use to assess Jane Doe's credibility, and argued how the evidence showed she was believable.  Defense counsel did not object to any of the prosecutor's argument.

Appellant now contends the prosecutor improperly and prejudicially argued that Dr. Urquiza's "testimony meant that the jury 'cannot' consider certain factors in judging the credibility of Jane Doe [], including her composed demeanor during the videotaped forensic interviews and the fact that her memory 'wasn't perfect in every detail.'"

29

## B.  Forfeiture

"'It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished . . . is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal.' [Citation.]" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1164.)  There is nothing in the record to indicate an objection would have been futile or that the prosecutor's conduct was "so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*People v. Centeno* (2014) 60 Cal.4th 659, 674; see *People v. Peterson* (2020) 10 Cal.5th 409, 464-465.)  Accordingly, we analyze the issue from the perspective of appellant's alternative argument that counsel's failure to object constituted constitutionally ineffective assistance.

## C.  Ineffective Assistance of Counsel

"An ineffective assistance claim has two components: A [defendant] must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 (*Wiggins*); *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  Both "are mixed questions of law and fact subject to our independent review." (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

Regarding the deficient performance component, "[t]here are countless ways to provide effective assistance [and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland, supra*, 466 U.S. at p. 689.)  Rarely is there only one reasonable strategy for a defense attorney to adopt when representing a client in a criminal case.  That other strategies might exist, or might appear in hindsight potentially to have stood a better chance at success, does not make the strategy employed unreasonable or counsel's performance deficient. (See *Maryland v. Kulbicki* (2015) 577 U.S. 1, 4; *People v. Jennings* (1991) 53 Cal.3d 334, 379-380.)

"To establish deficient performance, a [defendant] must *demonstrate* that counsel's representation 'fell below an objective standard of reasonableness,' [citation]" as measured by "'prevailing professional norms.' [Citation.]" (*Wiggins, supra*, 539 U.S.

at p. 521, italics added; cf. *Bobby v. Van Hook* (2009) 558 U.S. 4, 7 ["'[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices'[Citation.]"].)  Here, appellant has made no such demonstration; he merely asserts it.

"When applying this standard, we ask whether any reasonably competent counsel would have done as counsel did.  . . .  Judicial review of counsel's performance is deferential; to establish deficient performance, the defendant 'must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."'  [Citation.]" (*In re Gay, supra*, 8 Cal.5th at p. 1073; *Harrington v. Richter* (2011) 562 U.S. 86, 105 ["standard for judging counsel's representation is a most deferential one"]; *Bell v. Cone* (2002) 535 U.S. 685, 702 [same].)  Because deciding whether to object is inherently a tactical decision, the failure to do so will rarely establish ineffective assistance of counsel.  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)  And "[t]his is not one of those rare cases." (*Ibid.*)  Appellant has not met the first prong of the test.

As for the prejudice component of the test, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland, supra*, 466 U.S. at p. 693.)  Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)  "How readily deficient performance undermines confidence in the trial's outcome will in part depend on the strength of the trial evidence on any decisive points." (*In re Gay, supra*, 8 Cal.5th at p. 1087.)  "For a prosecutor's remarks to constitute misconduct, it must appear reasonably likely in the context of the whole argument and instructions that '"the jury understood or applied the complained-of comments in an improper or erroneous manner."' [Citation.]" (*People v. Winbush* (2017) 2 Cal.5th 402, 480.)  "'[W]e "do not

31

lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.)

Here, there is no indication the prosecutor's remarks about how to assess Jane Doe's credibility so "infect[ed] the trial with such unfairness as to make [appellant's] conviction a denial of due process [citation] or to render the verdicts unreliable." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1130.) Similarly, there is nothing in this record showing a reasonable probability the jury would have come to a different result had trial counsel objected.

Everything the prosecutor said was correct in terms of her explanations of what Dr. Urquiza's testimony could not be used for. Appellant myopically focuses on the fact she told the jurors they could not use certain aspects of Jane Doe's behavior in evaluating her credibility. However, in the context of her entire argument, she meant that merely because Jane Doe exhibited certain possibly incongruous behavior, the jury should not automatically disregard her testimony. And it must be remembered that the defense in this case was not that she was lying but that she misrecollected.

Furthermore, the trial court instructed the jury the attorneys' statements did not constitute evidence. (See CALCRIM No. 222.) We presume the jury followed the court's instructions (*People v. Martinez* (2010) 47 Cal.4th 911, 957), and appellant has provided nothing to rebut that presumption.

Appellant had a full opportunity "to challenge and rebut all evidence offered against him." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1109-1110; accord, *People v. Dykes* (2009) 46 Cal.4th 731, 762.) "A mere failure to object to argument seldom establishes counsel's incompetence[.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 531.) And "this case is no exception." (*Ibid.*) In light of the court's cautionary instructions and appellant's ability to challenge Jane Doe's testimony on cross-examination, we discern neither prejudice nor a denial of his right to a fair trial based solely on one isolated aspect

32

of the prosecutor's closing argument. This was not a close case, and it is not reasonably probable the result would have been different had trial counsel objected to the prosecutor's comments. Thus, appellant has failed to meet the second prong of the test.

Because he has shown neither deficient performance nor prejudice, appellant has failed to establish his counsel was constitutionally ineffective. (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391, 394; *In re Hardy* (2007) 41 Cal.4th 977, 1018.)

*6. CALCRIM No. 1193*

Appellant next contends the trial court violated his "due process and jury trial rights" by giving the CSAAS instruction, CALCRIM No. 1193. He bases the claim on the fact Dr. Urquiza did not actually testify about CSAAS, but rather about other, albeit similar, aspects of the behavior of child abuse victims and how that too may relate to their "believability."

*A. Additional Factual Background*

Defense counsel argued in his moving papers that if "testimony is introduced to dispel a myth[,] the jury must be instructed not to use that evidence to predict a molest has been committed," the evidence was "admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested," and "the expert's testimony is not intended and should not be used to determine whether the victim's molestation claims is [*sic*] true." He did not specifically ask for CALCRIM No. 1193, but his entire motion was predicated on CSAAS, he repeatedly used the acronym in his moving papers, and he assumed CSAAS evidence would be forthcoming.

In her initial list of proposed jury instructions, the prosecutor did ask for CALCRIM No. 1193. However, in her moving papers, she asked for a less specific, non-CALCRIM instruction similar to that given with approval in *People v. Gilbert* (1992) 5 Cal.App.4th, 1372, 1387. She argued by analogy that "[a]lthough the People will not

33

present syndrome evidence," CALCRIM Nos. 1192[14] and 1193 are examples of instructions that "legitimize the use of similar myth-dispelling evidence." The trial court granted the prosecution's request, but used an unmodified CALCRIM No. 1193, which included its references to CSAAS.

The court instructed the jury: "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." (See CALCRIM No. 303.) The court misread two sentences from CALCRIM No. 1193, and said: "You have heard testimony from Dr. Anthony Urquiza regarding [CSAAS]. Dr. Urquiza's testimony about [CSAAS] is not evidence that the defendant committed any charged acts against him. You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of her testimony."[15]

The court's verbal instruction therefore did not perfectly track the language of the standard instruction. More importantly, it was incorrect as a factual matter because Dr. Urquiza did not testify about CSAAS, or any other "syndrome." Instead, he testified more generally as to other aspects of behavior commonly exhibited by sexually abused children and how it relates to their credibility. But defense counsel did not object to the instruction as given, or request a modification or additional instructions.

*B. Legal Background*

We may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Pen. Code, § 1259; see *People v. Mitchell* (2019) 7 Cal.5th 561,

---

[14] CALCRIM No. 1192 involves Rape Trauma Syndrome evidence.

[15] The written version of CALCRIM No. 1193 in the clerk's transcript reads: "You have heard testimony from Dr. Anthony Urquiza regarding Child Sexual Abuse Accommodation Syndrome. [¶] Dr. Urquiza's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

34

579-580 [Because defendant "claims that the flawed instructions deprived him of due process, [which] would affect his substantial rights if true, his [instructional error] claim is not forfeited"].)

We review the wording of a jury instruction de novo and assess whether the instruction accurately states the law. In reviewing a claim of instructional error, we consider whether there is a reasonable likelihood the trial court's instructions caused the jury to misapply the law in violation of the Constitution. A challenged instruction is viewed in the context of the instructions as a whole as well as the entire trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. (*People v. Mitchell, supra,* 7 Cal.5th at p. 579; *People v. Richardson* (2008) 43 Cal.4th 959, 1028, abrogated on other grounds by statutory repeal in *People v. Nieves* (2021) 11 Cal.5th 404, 535 [an instruction is not examined in "artificial isolation"].) "'"'[W]e must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" [Citation.]' [Citations.]" (*People v. Covarrubias, supra,* 1 Cal.5th at p. 915; see *Estelle v. McGuire, supra,* 502 U.S. at p. 72.) And, as noted, we presume the jury followed the court's instructions. (*People v. Edwards, supra,* 57 Cal.4th at p. 746.)

### C. Analysis

Appellant claims giving a CSAAS instruction when there was no CSAAS evidence prejudicially affected his substantial rights. He focuses on the word "syndrome" in the instruction, and insists it was error to use it because the "[j]urors were not warned about ascribing too much meaning to the term," and it "invited the jury to draw the impermissible inference that [Jane Doe] suffered from a child abuse 'syndrome' because she displayed certain 'common characteristics.'"[16]

---

[16] Appellant also offers the argument that CALCRIM 1193 is "the legal equivalent of a traffic circle," because it "fails to make clear that the expert testimony 'should not be used to determine whether the victim's molestation claim is true.'" (Citation omitted.) Metaphors aside, this general attack on CALCRIM No.

35

We agree it was error to give the jury an instruction including a reference to "child sexual abuse accommodation syndrome" when it was never defined and there was no such CSAAS evidence. The instruction should have been modified to describe a more jargon-neutral, substantively similar admonishment. (See, e.g., *People v. Gilbert, supra,* 5 Cal.App.4th at p. 1387.)

Nonetheless, we fail to perceive how the underlying message the instruction was intended to convey – that Dr. Urquiza's expert testimony was to be used only for a limited purpose and not to show Jane Doe was actually molested – was prejudicially affected or that the outcome in this case would have been different if the instruction had been edited, and appellant offers no authority or argument to suggest otherwise. Similarly, nothing indicates the jury was improperly told how to use Urquiza's testimony or insufficiently advised as to its strictly limited purpose. And the idea the jury would have thought they were being told Jane Doe suffered from a child abuse syndrome so she must have been abused is . . . well . . . a stretch. We find nothing that indicates the jury did anything except follow their instruction to accept Urquiza's testimony for its strictly limited purpose.

Appellant insists the instruction was overly inflammatory and caused the jury to infer that Jane Doe was abused. In support, he relies on *State v. J.L.G.* (2018) 234 N.J. 265 (*J.L.G.*), in which the New Jersey Supreme Court held CSAAS evidence generally inadmissible and unscientific. (*Id.* at p. 272 ["We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than [certain limited evidence of] delayed disclosure, may no longer be admitted at criminal trials"].) We find *J.L.G.* contrary to well-established California law and therefore unpersuasive.

In *Munch, supra,* a case in which Dr. Urquiza did testify about CSAAS, our colleagues in Division Six of the Second District flatly rejected *J.L.G.*, stating, "*J.L.G.*

1193 has been repeatedly rejected and we see no basis to revisit the issue here. (See, e.g., *People v. Munch* (2020) 52 Cal.App.5th 464, 474 (*Munch*); accord, *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.)

involves an aberrant view of CSAAS," and was "'overly dismissive of the "accommodation" aspect of CSAAS.' [Citation.]" (*Munch, supra,* 52 Cal.App.5th at p. 470.) The court pointed out that *J.L.G.* relied on a journal article which was inconsistent with the general view held by child abuse experts and was subsequently challenged by experts in the field for poor statistical analysis. (*Id.* at pp. 470-471.)

Moreover, unlike New Jersey, most states – including California – have long permitted testimony on CSAAS and similar CSAAS-like behavior. (*Munch, supra,* 52 Cal.App.5th at pp. 470-471.) Our Supreme Court has held that even though "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused . . . it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident . . . is inconsistent with his or her testimony claiming molestation." (*McAlpin, supra*, 53 Cal.3d at pp. 1300-1301; cf. *Munch, supra,* 52 Cal.App.5th at p. 466 ["CSAAS evidence is a valid and necessary component of the prosecution case in matters involving child abuse"].)

Whatever it is called, such testimony is admissible to dispel specific myths or misconceptions by pointing out victims of childhood sexual abuse, as a group, often may exhibit behavior seemingly inconsistent with having been molested. (See *People v. Julian* (2019) 34 Cal.App.5th 878, 885; *Patino, supra,* 26 Cal.App.4th at pp. 1744-1745.) When a defense attorney places the credibility of the victim at issue, the prosecution may offer expert testimony to explain to the jury why, for example, a child victim would delay reporting the abuse. (*Ibid.*)

Although the trial court erred in retaining inapplicable terminology in the instruction, the underlying rationale for Urquiza's testimony was not affected. The word "syndrome" was never used by Dr. Urquiza, or by the attorneys. Its only appearance was in the jury instruction. More importantly, the instruction still fully informed the jury that it could not use Dr. Urquiza's testimony as proof that the abuse actually occurred, and the

trial court, Urquiza, and the prosecutor all repeatedly told the jury Urquiza made no diagnosis and his testimony could not be used to prove the truth of Jane Doe's allegations.[17]  Thus, we find the trial court's incorrect inclusion of the term – in the context of the jury instructions viewed as a whole – did not substantially affect appellant's rights, and there is no reasonable likelihood the jury applied the instruction in an impermissible manner.  (*People v. Mitchell, supra*, 7 Cal.5th at p. 579.)  The error was harmless.

*7.  Cumulative Error*

We have identified two trial court errors in this matter – asking a juror's irrelevant question and giving an unmodified jury instruction – neither of which was prejudicial.  Cumulating these two harmless errors does not lead us to a different result.  This was not merely a "he-said, she-said" case as appellant sometimes implies.  Jane Doe's consistent accounts of what transpired were corroborated by appellant's own damaging admissions and his letter of apology, and his testimony was far from convincing.  Appellant was "entitled to a fair trial, not a perfect one.  [Citation.]  Despite the trial court's error[s] here, nothing in the record indicates that [appellant's] trial was in any way unfair."  (*People v. Anzalone* (2013) 56 Cal.4th 545, 556.)  There was no cumulative reversible error.

*8.  The AIDS Testing Order*

Lastly, appellant contends the trial court's order requiring him to submit to AIDS testing was erroneous.  The Attorney General agrees, as do we.

---

[17]    Expanding on his traffic circle metaphor discussed *ante*  appellant uses Euclid's axiom of the transitivity of equivalence to posit a decidedly non-mathematical syllogism: "If A (expert testimony) equals B (complainant credible), and if B (complainant credible) equals C (defendant guilty), then A (expert testimony) equals C (defendant guilty)."  However, the flaw in his argument lies in the fact his first premise is false: A is not "equal" to B.  Or, as the *Munch* court pointed out, "a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability *one way or the other*, and that the CSAAS evidence does not show she had been molested."  (*Id.,* 52 Cal.App.5th at p. 474, italics added.)

38

Penal Code section 1202.1 provides in pertinent part that the trial court "[s]hall order every person who is convicted of . . . [Pen. Code, § 288, subd. (a)] . . . to submit to a blood or oral mucosal transudate saliva test for evidence of antibodies to the probable causative agent of acquired immunodeficiency syndrome (AIDS) within 180 days of the date of conviction." (Pen Code, § 1202.1, subd. (a).) However, it applies only if "the court *finds that there is probable cause* to believe that blood, semen, or any other bodily fluid capable of transmitting HIV has been transferred from the defendant to the victim." (Pen. Code, § 1202.1, subd. (e)(6)(A)(iii), italics added.)

Here, the trial court made no inquiry or finding there was probable cause to believe appellant had transferred bodily fluid to Jane Doe. As such, it was an unlawful to order testing. The proper remedy for this mistake is to remand the matter for further proceedings to determine whether the prosecution has additional evidence that may establish the requisite probable cause. (*People v. Butler* (2003) 31 Cal.4th 1119, 1123.)

Appellant suggests we should instead simply reverse and order the trial court to strike the AIDS testing order. However, "[g]iven the significant public policy considerations at issue, we conclude it would be inappropriate simply to strike the testing order without remanding for further proceedings to determine whether the prosecution has additional evidence that may establish the requisite probable cause." (*People v. Butler, supra,* 31 Cal.4th at p. 1129.) Accordingly, the appropriate remedy in this case is "to remand the matter for further proceedings at the election of the prosecution." (*Ibid.*)

DISPOSITION

The trial court's order requiring appellant submit to AIDS testing is vacated. The matter is remanded with directions to hold a hearing where the prosecution, if it so chooses, may present evidence to satisfy Penal Code section 1202.1. If the court

determines the prosecution failed to meet its burden, it is directed to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.



BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.

40